IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

TRACEY BOGLIN, WANDA )
ANDERSON, GLORIA BLACK, )
SENORA LOCKETT, BECKY )
MCDONALD, MARY RAWLINSON, )
DALISCIA SPEIGHTS, VIRGINSTINE )
THOMAS, CAROL WITHERSPOON, )
and CAROL YELLING, individually )
and as representatives of the class of )
persons described below, )
)
    Plaintiffs, )
)
v. )     CV 01-JEO-0643-S
)
JACKSON HEWITT, INC., d/b/a )
JACKSON HEWITT TAX SERVICE, )
)
    Defendant. )

## MEMORANDUM OPINION

This matter is before the court on the motion for summary judgment (doc. 23)[1] filed by

the defendant, Jackson Hewitt, Inc. (hereinafter "JHI"), and the motion for class certification

(doc. 22) filed by the plaintiff, Tracey Boglin (hereinafter "Boglin"). The court has reviewed the

motions, the briefs, and the evidentiary submissions and finds that the motion for summary

judgment is due to be granted and the motion for class certification is moot.

## PROCEDURAL BACKGROUND

The plaintiff commenced this action by filing a complaint, alleging claims against the

defendant for breach of contract, fraud, and negligence. (Complaint).[2] The complaint includes

---

[1] References to "Doc. ___" are to the documents as numbered by the Clerk of the Court in the court's record of the case.

[2] The complaint is found at document 1.

class allegations.  (*Id*.).  The plaintiffs assert that they entered into employment contracts with James E. Uptain Enterprises, Inc. (hereinafter "JEUEI"), and its owner, James Eugene Uptain (hereinafter "Uptain"), and that JEUEI and Uptain failed to pay them the bonus pay they were entitled.  JEUEI was a franchisee of the defendant.  The plaintiffs' counsel filed an amended complaint (doc. 4) and a second amended complaint (doc. 17), substituting Virginstine Thomas for Murry Thomas who is now deceased.

The defendant has filed a motion for summary judgment, asserting that it is not liable on the plaintiffs' claims for various reasons.  On the promissory estoppel claim, the defendant asserts it is not liable because (1) it never had any contract with the plaintiffs regarding their bonus pay; (2) Uptain and JEUEI were not the defendant's agents; (3) neither Uptain nor JEUEI made any representations to the plaintiffs on JHI's behalf; and, (4) there is no evidence that Uptain did not intend to pay the bonuses at the time the representations were made.  (Doc. 23 at ¶ 1).  As to the breach of contract claim, the defendant asserts that it was not a party to the contract and Uptain did not enter into the employment contracts with the plaintiffs on behalf of the defendant.  (*Id*. at ¶ 2).  As to the negligence claim, the defendant asserts that it is not liable because it was under no duty to investigate the financial ability of Uptain to pay his employees and, even if there is such a duty, the defendant fulfilled its duty under the circumstances.  (*Id*. at ¶ 3).

The plaintiffs filed a motion for class certification on the same date the defendant filed its motion for summary judgment.  (Doc. 22).

## SUMMARY JUDGMENT STANDARD

The court shall grant summary judgment "if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). Initially, the moving party bears the burden of proof "to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991).

The moving party can satisfy his burden by presenting evidence that there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of his case on which he bears the ultimate burden of proof. *Celotex,* 477 U.S. at 322-23; FED. R. CIV. P. 56(a) and (b).

Should the moving party meet his burden of proof, "the burden shift[s] to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark,* 929 F.2d at 608. Material facts are those that might affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Genuine material facts are those material facts that could cause a reasonable jury to return a verdict for the nonmoving party. *Anderson,* 477 U.S. at 248. The nonmoving party need not present evidence in a form necessary for admission at trial, however, the movant may not merely rest on the pleadings. *Celotex,* 477 U.S. at 324.

The court should consider the pleadings, depositions, and affidavits in the case before reaching its decision, and all reasonable inferences should be made in favor of the nonmovant. *Griesel v. Hamlin,* 963 F.2d 338, 341 (11th Cir. 1992). The judge's role is "not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine

3

issue for trial." *Anderson,* 477 U.S. at 249.

## FACTUAL BACKGROUND[3]

### JHI

JHI is a nationwide tax return preparation business. (Curt Hapward Affidavit (hereinafter "Hapward Aff." at ¶ 4).[4]  It is a Virginia corporation with its principal place of business in New Jersey. (*Id.*).  JHI grants exclusive licenses in selected territories to individuals and entities to operate tax preparation businesses under its name. (*Id.*).  As a part of the franchise, the franchisee is permitted to use JHI's "proprietary business methods and software (hereinafter 'Operating System')." (*Id.*).

Each franchisee is required to execute a standard Franchise Agreement. (Hapward Aff. at ¶ 5).  In return for the use of JHI's name and Operating System, a franchisee is required to meet certain requirements to ensure that JHI is paid and to protect JHI's goodwill and trademarks. (*Id.*).  The Agreement requires, among other things, that the franchisee pay certain fees, that it use JHI trademarks only in compliance with the Agreement, and that it identify itself as "Jackson Hewitt Tax Service" along with a phrase providing that it is "locally owned and operated." (*Id.*).

### Uptain and JEUEI

In Spring 1998, Uptain expressed an interest in owning several JHI territories in Alabama. (Uptain Dep. (hereinafter "Uptain Dep.") at 11).[5]  Uptain was then working as a

---

[3] The facts set out below are gleaned from the parties' submissions and are viewed in a light most favorable to the plaintiff. They are the "'facts' for summary judgment purposes only. They may not be the actual facts. *See Cox v. Administrator U.S. Steel & Carnegie,* 17 F.3d 1386, 1400 (11ᵗʰ Cir. 1994)." *Underwood v. Life Insurance Co. of Georgia,* 14 F. Supp. 2d 1266, 1267 n.1 (N.D. Ala. 1998).

[4] The affidavit is located at document 26, tab 12.

[5] Uptain's deposition is located at document 26, tab 1.

4

manager for H&R Block, managing twenty-one locations. (*Id*. at 10, 94). He had seventeen

years experience with H&R Block. (*Id*.). He applied to become a franchise owner on March 20,

1998. He was interviewed a short time later by a JHI representative. JHI also required Uptain to

provide a personal financial statement. (Hapward Dep. at 47 & Ex. 1). JHI obtained a credit

report to verify the information provided by Uptain. (*Id*. at 27-29 & Ex. 3). At the time of the

application, Uptain had a net worth of $529,739.00. (Uptain Dep. at 72-73 & Ex. 2). The "Brief

Summary" of the interview states, "Strong on operational skills. Has taken a pretty thorough

look at JH. Should be fine with a little patience." (Hapward Dep. at Ex. 2, p. 2).

A JHI committee reviewed and approved Uptain's application. (Hapward Dep. at 47).

Uptain, through his company, JEUptain Enterprises (hereinafter "JEUEI")[6] entered into Franchise

Agreements for territories in Tuscaloosa, Alabama, on May 31, 1998, and for territories in

Birmingham, Alabama, on June 20, 1998. (Uptain Dep. at Ex. 1 & 2).

### The Franchise Agreements

The Franchise Agreements executed by JHI and Uptain for the Tuscaloosa and

Birmingham territories enumerate the rights and obligations of the parties thereto. JEUEI was to

operate as a JHI franchise, preparing tax returns with JHI tax software. The customer would pay

a fee for its services and JEUEI would pay a royalty to JHI from the fees.

The Franchise Agreements provide, in part, as follows:

2.2. *Nature of Relationship*. You acknowledge that this Agreement grants you a
license to use our Marks and our operating system. You acknowledge that we do
not have any right to share any of the profits of your business since you are an
independent contractor, and you are not our joint venturer, partner, agent or
employee. We also do not share in your losses.

---

[6] JEUEI, James E. Uptain Enterprises, Inc., and JEUptain Enterprises all refer to the same entity.

5

14.8. *Location Employees.* Since you are an independent contractor, you have the sole right to select, hire and discharge your employees. You are responsible for all decisions regarding hiring, firing, training, supervising, disciplining, scheduling and paying wages to (including payment of taxes) your employees. Neither you, nor your manager or your employees shall be considered or represented as our employees or agents. Moreover, neither you, nor your manager or your employees are authorized to enter into any contract or agreement with any third party on our behalf.

14.21. *Identification.* You must post at your sites in a format that we approve or specify, signs that identify the name of the legal entity by which you own or operate the franchised business, and that includes the statement that your entity is an independently owned and operated franchise. Your business checks must also comply with this requirement. You must enter into all agreements using your correct legal name. You may not use the name "Jackson Hewittt Tax Service" or "Jackson Hewittt Inc." to sign any agreement, including, but not limited to, any lease for the franchised business, any telephone services or Yellow Pages advertising, any equipment leases, or bank financing or employment agreements.

33.12. *Independent Contractors.* You acknowledge that you are an independent contractor and that no principal-agent, partnership, employment, joint venture or fiduciary relation exists between you and us. You are solely liable for any damages to any person or property arising directly or indirectly out of the operation of your franchised business. You are solely liable for any taxes levied on you, or for any rental or utility payments, telephone or advertising or Yellow Pages charges. You are not authorized to make any contract, warranty or representation, or incur any obligation on our behalf. You must enter into all contracts, agreements, purchase orders, and leases with third parties using the name of the entity that signed this agreement. You may not use "Jackson Hewitt Inc.", "Jackson Hewitt" or "Jackson Hewitt Tax Service" or any similar name to enter into any contract or in any dealings with third parties. This Agreement is solely a license to use the name "Jackson Hewitt Tax Service®" in a tax return preparation business using our Marks and our operating system.

(Franchise Agreement at ¶¶ 2.2, 14.8, 14.21 & 33.12).[7]

## Operating JEUEI

Uptain displayed signs at his various locations referencing that JEUEI was locally owned

and operated. (Uptain Dep. at 79-80). Uptain also instructed that all of the JHI materials were to

---

[7] A copy of a Franchise Agreement is located at document 28, tab A.

contain a similar statement. (*Id.*). He presumed that his instruction was followed. (*Id.* at 80-81). During the depositions of certain plaintiffs, they testified that they remembered seeking such designations in the JEUEI locations. (Tracey Boglin Dep. (hereinafter "Boglin Dep.")[8] at 27, Carol Yelling Dep. (hereinafter "Yelling Dep.")[9] at 81, Virginstine Thomas Dep. (hereinafter "Thomas Dep.")[10] at 23, Gloria Black Dep. ("Black Dep.")[11] at 24). Additionally, documents produced during the discovery period included such designations. (*See* Boglin Dep. at Ex. 3).

In order to operate the business, Uptain hired Jane Decker and Sheila Carroll to manage the stores. (Uptain Dep. at 67 & 69). He also hired individual tax preparers. (*Id.* at 40). The employment contracts were entered into in the name of JEUptain Enterprises. (*Id.* at 81). The form used to hire the tax preparers was a JHI provided form. (*Id.* at 46; Black Dep. Ex. 1). JHI's suggested rates of pay were not followed by Uptain. (Uptain Dep. at 89, 96-97). The plaintiffs contracted to be paid an hourly wage plus a 20% bonus that was due "within 45 days after the end of the Tax Season." (Black Dep. at Ex. 1). JHI provided sample employment contracts, but it was within the franchisee's discretion whether or not to use the same. (Uptain Dep. at 48; Hapward at ¶ 6). The contracts stated that the individual "accepts employment with JEUEI trading as Jackson Hewitt Tax Service." (Boglin Dep. at Ex. 1, p. 1).

The employees were trained by Decker and Carroll using a JHI textbook. (Uptain Dep. at 40, 68). Decker and Carroll handled the employee hiring, scheduling, leave, payroll, and the day-to-day office procedures. (Boglin Dep. at 17 & 23; Daliscia Speights Dep. (hereinafter

---

[8] Boglin's deposition is located at document 26, tab 3.

[9] Yelling's deposition is located at document 26, tab 8.

[10] Thomas's deposition is located at document 26, tab 9.

[11] Black's deposition is located at document 26, tab 6.

Speights Dep.) at 21 & 37;[12] Black Dep. at 53 & 58; Mary Rawlinson Dep. (hereinafter "Rawlinson Dep.") at 58, 62, & 66-67);[13] Carol Witherspoon Dep. (hereinafter "Witherspoon Dep.") at 36-37).

The tax returns were prepared using JHI forms and computer software. (*Id.* at 42, 46). They were transmitted electronically to JHI headquarters in Virginia Beach, Virginia. (*Id.* at 42-44).

JHI imposed no mandatory requirements concerning the hiring and supervision of employees by the local franchisee. (Hapward Aff. at ¶¶ 6 & 7). JEUEI was responsible for administering the plaintiffs' wages and bonus pay. (Uptain Dep. at 78). JHI does not review local employee compensation issues. (Hapward Aff. at 2). The plaintiffs were paid out of JEUEI's payroll account in Birmingham. (Uptain Dep. at 49-50). JEUEI's payroll records were on JHI forms. (Uptain Dep. at Ex. 8). The plaintiffs were paid their hourly wages as agreed. They were not, however, paid their bonuses at the end of the tax season. (Boglin Dep. at 35).

JEUEI ultimately failed as a business. (Uptain Dep. at 24-25). Uptain attributed the failure to an inability to meet the demands of the customers due to various problems, including technical problems such as printing customer checks. (*Id.*). As a consequence, Uptain did not pay the plaintiffs their bonuses. (*Id.* at 54).

The plaintiffs attempted to collect their bonuses, but were unsuccessful. Boglin contacted Uptain only to be told that they would not be receiving their bonus checks. (Boglin Dep. at 33). When Boglin called JHI's corporate office, she was referred to Uptain. (*Id.* at 37).

---

[12] Speight's deposition is located at document 26, tab 5.

[13] Rawlinson's deposition is located at document 26, tab 7.

8

## DISCUSSION

### Breach of Contract

As stated at the outset, this diversity case arises from the failure of JEUEI and Uptain to pay the plaintiffs bonus pay they were entitled.  The plaintiffs assert a contract claim against the defendant (JHI) purportedly premised upon theories of direct and vicarious liability.  (Second Am. Comp. at ¶ 35).[14]  "To prevail on a claim for breach of contract, the plaintiff must establish: '(1) proof of a valid and enforceable contract; (2) the terms and conditions of the contract, including the contract price; (3) a breach of the contract; and (4) damages.' *Baxter v. Jones,* 529 So. 2d 217, 222 (Ala. 1988)." *Whaley v. Sony Magnetic Products, Inc. of America*, 894 F. Supp. 1517, 1526 (M.D. Ala. 1995).[15]  *See also State Farm Fire & Cas. Co. v. Slade*, 747 So. 2d 293 (Ala. 1999) (the plaintiff must prove (1) the existence of a valid contract, (2) the plaintiff's own performance under the contract, (3) the defendant's nonperformance, and (4) damages).  A "'[b]reach' consists of the failure without legal excuse to perform any promise forming the whole or part of the contract.' *McGinney v. Jackson,* 575 So. 2d 1070, 1071-72 (Ala. 1991) (*citing* 17 Am. Jur. 2d *Contracts* § 441 at 897 (1964))." *Dickinson v. Cosmos Broadcasting Co., Inc.*, 782 So. 2d 260, 265 (Ala. 2000).

The defendant first asserts that it was not a party to the contract at issue and therefore cannot be liable thereunder.  (Doc. 24 at 26).  The plaintiff disagrees.  (Doc. 28 at 11).

The defendant was not a named party to the plaintiffs' employment contracts.  Accordingly, the only basis for imposing liability on JHI is through agency principles.  The

---

[14] The second amended complaint is located at document 17.

[15] The parties do not dispute the applicability of Alabama law in this matter.

plaintiffs assert that it is the agency relationship between the franchisor (JHI) and the franchisee

(JEUEI) that creates liability for the defendant in this action.  (Doc. 28 at 11-12).

In *Thrash v. Credit Acceptance Corp.*, 821 So. 2d 968, 971-72 (Ala. 2001), the Alabama

Supreme Court stated:

> . . . . This Court stated the controlling principles of agency law in
> *Malmberg v. American Honda Motor Co., Inc.*, 644 So. 2d 888, 890 (Ala. 1994):
>
>> "Agency is generally a question of fact to be determined by
>> the trier of fact.  *See Oliver v. Taylor*, 394 So. 2d 945 (Ala. 1981).
>> When a defendant's liability is to be based on agency, agency may
>> not be presumed; rather, when on a motion for summary judgment
>> a defendant has made a prima facie showing that there was no
>> agency relationship, the party asserting agency has the burden of
>> presenting substantial evidence of the alleged agency.  *Carlton v.
>> Alabama Dairy Queen, Inc.*, 529 So. 2d 921 (Ala. 1988); *Wood v.
>> Shell Oil Co.*, 495 So. 2d 1034 (Ala. 1986).  The *test* to be applied
>> in determining whether there existed an agency relationship based
>> on actual authority is whether the alleged principal exercised a
>> *right of control* over the manner of the alleged agent's
>> performance.  Control must be proven; and proof of control
>> requires more than proof of a mere right to determine if the person
>> claimed to be an agent is conforming to the requirements of a
>> contract.  *Id.*"

(Emphasis added.)  The right-of-control test requires that the right be reserved, not
that the right be actually exercised.

>> "The test for determining whether a person is an agent or
>> employee of another, rather than an independent contractor with
>> that other person, is whether that other person has reserved the
>> right of control over the means and method by which the person's
>> work will be performed, whether or not the right of control is
>> actually exercised.  *Alabama Power Co. v. Beam*, 472 So. 2d 619
>> (Ala. 1985).  How the parties characterize the relationship is of no
>> consequence; it is the facts of the relationship that control."
>> *Martin v. Goodies Distribution*, 695 So. 2d 1175, 1177 (Ala.
>> 1997).

The plaintiffs assert that the defendant's right of control of Uptain's conduct is evidenced

in this case. In support of this contention, the plaintiff relies on *Patterson v. Western Auto Supply Company*, 991 F. Supp. 1319, 1323 (M.D. Ala. 1997) and *Parker v. Domino's Pizza, Inc.*, 629 So. 2d 1026 (Fla. Dist. Ct. App. 1993).

The *Patterson* case was a products liability action precipitated by the death of a mother and her children in a car accident purportedly caused by the sale one month earlier of oversized tires by an employee of an independently owned Western Auto store. The plaintiffs argued that Western Auto was liable because of an agency relationship that existed between it and the store owner. Western Auto in turn argued that the owner was an independent contractor. The court in analyzing the arguments cited *Mobil Oil Corp. v. Bransford*, 648 So. 2d 119 (Fla. 1995).

In the *Mobil* case, a customer sued the defendant after he was beaten by an employee of a Mobil Mini Mart gas station that was leased to another person. The plaintiff asserted that Mobil was liable because "it had effectively established an apparent agency relationship with the leaseholder." *Id.*, 648 So. 2d at 120. The plaintiff further asserted in support of his argument "that Mobil owned the property, that Mobil products were sold in the station, that Mobil trademarks and logos were used throughout the premises, and that the franchise agreement with Mobil required the use of Mobil symbols and the selling of Mobil products." *Id.* He also asserted that "Mobil allegedly sent its representatives to the station to provide various routine franchise support services." *Id.* The trial court granted summary judgment in favor of Mobil. The Florida District Court of Appeals reversed. Reviewing that decision, the Florida Supreme Court stated:

> We find Bransford's allegations legally insufficient to plead a case against Mobil. In today's world, it is well understood that the mere use of franchise logos and related advertisements does not necessarily indicate that the franchisor has actual or apparent control over any substantial aspect of the franchisee's business

11

or employment decisions.  Nor does the provision of routine contractual support services refute this conclusion.  Here, the contract itself expressly stated that Berman "is an independent businessman, and nothing in this contract shall be deemed as creating any right in [Mobil] to exercise any control over, or to direct in any respect, the conduct or management of [the] business."

Franchisors may well enter into an agency relationship with a franchisee if, by contract or action or representation, the franchisor has directly or apparently participated in some substantial way in directing or managing acts of the franchisee, beyond the mere fact of providing contractual franchise support activities.  However, nothing in the present record sufficiently establishes that the parties to the instant contract ceased to honor the contract's own terms, actually or apparently.  There thus is no remaining issue of material fact to support the district court's decision as to Mobil.

*Mobil*, 648 So. 2d at 120-21.

The *Patterson* court denied Western Auto's motion for summary judgment that asserted that the owner was an independent contractor.  Construing Florida law, the court found that there was a question of fact for the jury regarding whether the store owner was an agent of Western Auto or whether he was an independent contractor.  *Id.*, 991 F. Supp. at 1323.  It stated:

Contrary to Western Auto's assertions, and the facts of *Mobil Oil*, a review of the record reveals the existence of a jury question as to the extent of control exercised by Western Auto and whether that interaction between Western Auto and McBride was enough to establish an agency relationship.  For example, in the "Associate Store Contract" entered into by Western Auto and McBride, the parties agreed that McBride would operate under a "Flag Store Plan," where McBride was to install in the store, at its own expense, a store layout and design plan promulgated by Western Auto. . . .  McBride was required to follow Western Auto stock plans and was required to get Western Auto's permission, in writing, to make certain stock changes. . . .  McBride had to "adequately stock, display and aggressively promote" Western Auto brands. . . .  McBride was required to purchase from Western Auto a "model stock bin tag program" for updating inventory and "an electronic ordering system which provides a convenient and efficient method of ordering goods from Western Auto.". . . .

McBride was required to spend three and one-half percent of annual gross sales on advertising and was required to use advertising supplied or approved by Western Auto. . . .  McBride's management was required to complete up to four weeks of Western Auto training, which included "classroom training, in-store

12

training, or both, as may be determined by Western Auto at its sole discretion.". . . Western Auto had the right to enter and inspect McBride's store to check "merchandise, furnishings, fixtures, operating methods, and books and records." . . . Further, McBride was required to keep adequate business records, and was required to furnish Western Auto with financial statements, including a balance sheet and profit-and-loss statements. . . . To accomplish this, McBride was required to comply with the terms of a Western Auto bookkeeping plan or was required to develop another plan acceptable to Western Auto. . . .

Western Auto also articulated what type of insurance McBride was required to purchase and required McBride to make provision for workers' compensation insurance, social security, unemployment insurance, and unemployment compensation disability. . . . Additionally, the deposition of Curtis Miller, provided by Western Auto in support of its motion for summary judgment, establishes *inter alia* that: (1) Western Auto employees would direct McBride to clean and organize the store in certain ways; (2) Western Auto directed McBride to paint a certain color scheme on the outside of the store; and (3) Western Auto dominated McBride's inventory and pricing. These and other factors in the record establish that the relationship between Western Auto and McBride was more involved than the relationship analyzed by the Florida Supreme Court in Mobil Oil. Under the summary judgment standard articulated above, the question of whether the relationship establishes agency is one for the jury.

*Patterson*, 991 F. Supp. at 1324-25.

In *Parker*, the plaintiffs sued Domino's Pizza, the franchisor, after they were struck and injured by a vehicle operated by a local delivery driver. Domino's moved for summary judgment, which the trial court granted. The Florida District Court of Appeals reversed the holding, finding that the franchise agreement and operating manual provided by Domino's to the local franchisee led "to the self-evident conclusion that it was error" to grant the motion. *Id.*, 629 So. 2d at 1029. In support of its reasoning, the court cited extensively from Domino's franchise agreement and operating manual. These documents demonstrated that little discretion was permitted the franchisee in conducting its business. The court stated that the operating manual was "a veritable bible for overseeing a Domino's operation." *Id.* Specifically, the court noted:

It [(the manual)] contains prescriptions for every conceivable facet of the

13

> business: from the elements of preparing the perfect pizza to maintaining accurate
> books; from advertising and promotional ideas to routing and delivery guidelines;
> from order-taking instructions to oven-tending rules; from organization to
> sanitation. The manual even offers a wide array of techniques for "boxing and
> cutting" the pizza, as well as tips on running the franchise to achieve an optimum
> profit. The manual literally leaves nothing to chance. The complexity behind
> every element of the operation gives new meaning to the familiar slogan that
> delivery is to be, "Fast, Hot and Free."

*Id.*

*Patterson*, *Mobil*, and *Parker* are all factually distinguishable from the present case and

they involve construction of Florida law. They do demonstrate, however, the importance of

individual consideration of the facts. Thus, this court must apply the controlling Alabama

principles cited at the outset of this section to the present facts. The court is particularly drawn to

the decisions in *Wood v. Shell Oil Co.*, 495 So. 2d 1034 (Ala. 1986) and *Carlton v. Alabama

Dairy Queen, Inc.*, 529 So. 2d 921 (Ala. 1988).

In *Wood*, the plaintiff sued Shell Oil Co. and the individual local dealer to recover for

injuries he sustained when he slipped and fell due to ice on the property of the lessee (Parker

Shell). The plaintiff asserted that Shell Oil was vicariously liable for Parker's negligence under a

theory of respondeat superior. The argument was premised upon the terms of the lease, the

dealer's agreement with Shell, and the use of the Shell Oil insignia by Parker's employees. The

pertinent issue was whether Parker Shell was the real or apparent agent of Shell Oil. The trial

court granted summary judgment on behalf of Shell Oil. On appeal, the Alabama Supreme Court

affirmed the granting of the motion. It stated the relevant inquiry:

> The test to be applied in determining the existence of an agency
> relationship under the doctrine of respondeat superior is whether the alleged
> principal reserved a right of control over the manner of the alleged agent's
> performance. *Williams v. Tennessee River Pulp & Paper Co.*, 442 So. 2d 20 (Ala.
> 1983). The retained right to supervise the alleged agent to determine if that

14

person conforms to the performance required by a contract with the asserted
principal does not, itself, establish control. *Williams*, *supra*.

*Wood*, 495 So. 2d at 1036. The court examined the pertinent contract provisions and other

relevant evidence, including:

> (1) [that the] dealer [was] to remain open 24 hours per day; (2) Shell Oil
> [was required to] approv[e] of all alterations on the premises; (3) [the] dealer
> [was] to maintain the premises and to make repairs, including painting and
> checking for leakage in storage tanks, in accordance with Shell Oil's
> specifications or recommendations; (4) [the] dealer's station [was] to be of an
> architectural design approved by Shell Oil; (5) [the] dealer [was] to diligently
> merchandise and promote petroleum products purchased by the dealer;
> (6) mechanical work performed to be done in a workmanlike manner; (7) [the]
> dealer [was] to maintain an adequate and competent staff of employees; (8) Shell
> Oil [had] the right to offer supplemental training to the dealer's employees;
> (9) [the] dealer and employees [were] to wear clean uniforms of a type and style
> approved by Shell Oil; (10) [the] dealer [was] to notify Shell Oil of any injuries or
> damage; (11) Shell Oil [had] the right to inspect the dealer's premises, books, and
> records to determine compliance with the terms of the dealer agreement; and
> (12) Shell Oil [had] the right to terminate the agreement, at its option, for failure
> of the dealer to carry out these provisions. In addition to these terms and
> conditions, the plaintiff cited the dealer's testimony that Shell Oil provided
> awards to its dealers based upon cleanliness, appearance, and professionalism,
> provided service and/or product bulletins, and sponsored dealer meetings and
> promotions twice each year. 495 So. 2d at 1037.

*Carlton*, 529 So. 2d at 924 (summarizing the facts in *Wood*). The *Wood* court concluded as

follows:

> We are of the opinion that Wood has produced no evidence that Shell Oil
> retained any right of control over the manner in which Parker Shell performed in
> order to meet the requirements of the lease and dealer agreement. Although the
> lease and the dealer agreement specify, in some detail, what Parker Shell must do
> in order to conform to the terms of these contracts, and gives Shell Oil a right to
> approve certain aspects of Parker Shell's operation, they do not determine how
> Parker Shell is to achieve compliance with these terms. Of course, a contract
> which, on its face, directly disclaims any agency relationship or which does not by
> its terms create such a relationship, will not preclude the finding of agency if there
> is independent evidence of a retained right of Control. *Bond v. Trim-Line, Inc.*,
> 465 So. 2d 365 (Ala. 1985). However, Wood has not provided any independent
> evidence regarding the relationship between Shell Oil and Parker Shell from

which a jury could infer an agency relationship. Shell Oil's motion for summary judgment on the issue of actual authority was properly granted.

*Wood*, 495 So. 2d at 1037.

In *Carlton*, the plaintiff sued Alabama Dairy Queen and International Dairy Queen (hereinafter "Dairy Queen"), and their licensee on a wrongful death claim that was the result of an accident caused by the licensee's employee who spilled cooking oil on the highway. The trial court granted summary judgment for the Dairy Queen defendants finding they were not liable. Applying *Wood*, as well as other authorities, the court affirmed the trial court's grant of summary judgment on behalf of Dairy Queen. In doing so, the court stated:

> The test to be applied in determining the existence of an agency relationship under the doctrine of respondeat superior is whether the alleged principal has control over the manner of the alleged agent's performance. However, the right to determine if an alleged agent is conforming to the requirements of a contract does not, in itself, establish control.

*Carlton*, 529 So. 2d at 923. The facts demonstrated that the Dairy Queen defendants had various rights pursuant to their contract with the licensee, including the rights (1) to inspect the store; (2) to test and sample the supplies and products; and, (3) to inspect the cleanliness of the store. The licensee also was required to "hire efficient, competent, sober employees who must work in uniforms approved by the company." *Carlton*, 529 So. 2d at 922. The agreement further required that (1) "uniformity shall be maintained;" (2) the store was required to be constructed in accordance with the plans furnished, or as approved by Dairy Queen; (3) Dairy Queen had the right to control any trademark litigation; (4) the store was to maintain liability insurance; (5) the store was to use a Dairy Queen Freezer; (6) Dairy Queen reserved the right to require that the store be open 335 days a year; and, (7) the store was to pay Dairy Queen a fee for every gallon of liquid "mix" used in making the dairy products. *Id.*

16

The court held that there was no evidence to show that the actions by the Dairy Queen defendants were intended to control the employee's actions in the disposal of the grease. *Id.* at 923. The court also noted that the dealer had not participated in various Dairy Queen food programs; he did not purchase his food products from Dairy Queen; the grease at issue was produced as a by-product of the store's activities; Dairy Queen representatives did not make any recommendations as to the method of preparation of the food or the disposal of the cooking oil by-products; the store owner had the authority to hire and fire employees, to train them, and to set their wages; the store owner could decide what products to purchase from Dairy Queen; he could set his prices; and, he had discretion in preparing the non-ice cream products. *Id.* at 925. Accordingly, the court affirmed the granting of the motion for summary judgment.

In the present case, it is clear that JHI did not retain or have any control over Uptain, JEUEI, or JEUEI's managers regarding bonus pay for the franchise employees under the franchise agreement. Therefore, the pertinent question is whether the defendant's retention of control over other areas is sufficient to establish an agency relationship. As stated above, the plaintiffs assert that the defendant's right of control over various aspects of Uptain's activities is sufficient to overcome the motion for summary judgment. Specifically, the plaintiffs assert that the following demonstrate the defendant's right of control: (1) the franchise agreement required the franchisee to pay advertising and marketing fees equal to six percent of the gross volume (doc. 28 at 7); (2) the agreement required the defendant to approve the franchisee's advertising (*id.* at 8); (3) the agreement allowed the defendant to impose certain construction constraints (*id.* at 9); (4) Uptain was required to provide the defendant with financial statements (*id.*); (5) the defendant had control over the type of insurance coverage carried by Uptain (*id.* at 9-10); and, (6)

17

the defendant maintained the right to inspect the franchisee locations (*id.* at 10).

The court does not find these limitations on Uptain's activities to be sufficient. As just stated, they do not relate to bonus pay. In fact, they do not apply to employee pay or compensation at all. None of these items even pertain to the day-to-day operations of Uptain's franchises. The plaintiff has not produced any evidence or otherwise demonstrated that JHI "retained any right of control over the manner in which [Uptain] performed in order to meet the requirements of the [Franchise Agreement]." *Wood*, 495 So. 2d at 1037. Although it is evident that JHI did have the right to approve and control certain aspects of Uptain's operations, it did not limit, restrict, or control how he was to achieve compliance with the terms of the agreement. Limitations on advertising outside of the franchisee's area; the payment of advertising fees to the defendant; construction constraints; requirements that financial statements be provided; requiring insurance coverage; and, rights of inspection are not sufficient to demonstrate a right of control over the manner of Uptain's performance to create liability in this case.[16] *See Wood*, 495 So. 2d at 1037; *Carlton*, 529 So. 2d at 924-25. Uptain's deposition testimony is consistent with this finding in that he testified that he did not recall anyone from JHI never talking with him about paying bonuses. (Uptain Dep. at 63).

The court also notes that the Franchise Agreements in this matter expressly provide that Uptain is not JHI's agent. (*See* Franchise Agreement at ¶ 33.12 ("[Uptain] acknowledge[s] that [he is] an independent contractor and that no principal-agent, partnership, employment, joint venture or fiduciary relation exists [with JHI];" ¶ 14.8 ("Neither you, nor your manager or your

---

[16] Similarly, the fact that the Franchise Agreement in this case includes restrictions on the minimum hours that the locations must be open (*see* Agreement at ¶ 14.10) is insufficient to demonstrate any agency relationship. *Wood*, 495 So. 2d at 1036-37.

employees shall be considered or represented as our employees or agents.")).  Although the terms

of the agreement are not dispositive of this issue, they cannot be ignored.

Having found that the defendant did not have sufficient actual right of control over

Uptain's activities to impose agency liability, the next inquiry is whether Uptain had sufficient

apparent or implied authority to impose agency liability.[17]  "The doctrine of apparent authority is

based upon the actions of the principal, not those of the agent; it is based upon the principal's

holding the agent out to a third party as having the authority upon which he acts, not upon what

one thinks an agent's authority might be or what the agent holds out his authority to be."

*Malmberg*, 644 So. 2d at 891.

The Franchise Agreement required that Uptain post signs that specified what type of

"legal entity" he was operating under.  (Franchise Agreement at ¶ 14.21).  It also required that the

signs state that the location was an "independently owned and operated franchise."  (*Id.*).  It

further required that he was not permitted to enter into any contracts on behalf of JHI and that he

was not "authorized to make any contract, warranty or representations, or incur any obligation on

[JHI's] behalf."  (*Id.* at ¶ 33.12).

As noted by the defendant, and not disputed by the plaintiff, "[t]he evidence establishes

that Uptain complied with these provisions."  (Doc. 24 at 19).  For example, the employment

contracts at issue were between the individual tax preparer and JEUEI.  Additionally, Thomas,

Black, Yelling, and Boglin testified that they recalled seeing the independent ownership

statement in the workplace.  (Thomas Dep. at 23, Black Dep. at 24, Yelling Dep. at 81, and

Boglin Dep. at 27).  Still further, Uptain did not consider himself or his managerial staff to be

---

[17] The plaintiff appears to premise her agency liability argument on actual control under the Franchise Agreement rather than apparent authority.  However, for completeness, this aspect of agency liability will also be addressed.

agents of JHI. (Uptain Dep. at 68 & 70, 76-78). He testified that he never instructed his staff to hold themselves out as agents or employees of JHI. (*Id.*).

To the extent it could be argued that the plaintiffs relied upon JHI allowing Uptain to use the JHI name and trademark in the workplace and on forms and documents at the franchise locations, the court does not find this sufficient to impose agency liability. In *Malmberg*, the court stated that displaying logos "upon signs, literature, products, brochures, and plaques . . . was 'not sufficient, in itself, to create an inference of agency.'" *Id.*, 644 So. 2d at 891, *citing Wood*. Under the particular facts herein, the use of the JHI name and trademark at the franchise locations is insufficient to impose liability.

Due to the absence of an adequate showing of an agency relationship, the defendant's motion for summary judgment is due to be granted on the plaintiffs' contract claim.

**Fraud**

The plaintiffs assert a "fraud" claim premised on JHI's failure to pay them the bonuses they are due. They undergird JHI's liability on the fact that "Uptain, acting as an agent for Defendant," contracted with them to pay the bonuses and JHI had sufficient "right" of control over Uptain to impose agency liability. (Doc. 28 at 6-7). The defendant counters in its motion for summary judgment that the plaintiffs' "fraud" claim is in fact a claim of "*promissory* fraud" and is due to be dismissed. (Doc. 28 at 14) (italics in original). It offers various defenses, including that (1) there was no misrepresentation by JHI (doc. 24 at 14); (2) there was no agency relationship because JHI did not control Uptain's conduct (*id.* at 15) and because there is no evidence of apparent or implied agency (*id.* at 19-20); and, (3) there is no promissory fraud (*id.* at 21-25).

20

In order for a plaintiff to establish a claim for fraudulent misrepresentation, she must prove four elements: (1) a false representation made concerning a material fact, (2) that the defendant made the representation knowing it was false, or made it recklessly or made it with no knowledge as to its truth or falsity, (3) that the plaintiff relied upon the false representation, and (4) that the plaintiff was damaged as a proximate result of the reliance. *George v. Associated Doctors Health & Life Ins. Co.*, 675 So. 2d 860, 862 (Ala. 1996) (*citing Jarrard v. Nationwide Mutual Ins. Co.*, 495 So. 2d 584 (Ala. 1986). If the claim is based on a promise to perform in the future, the plaintiff must also show that at the time of the alleged misrepresentation, the defendant had the intention not to perform the promised act and an intent to deceive. *Gardner v. State Farm Mutual Automobile Insurance Co.*, 822 So. 2d 1201, 1209 (Ala. Civ. App.), *aff'd. Ex parte Gardner*, 822 So. 2d 1211 (Ala. 2001).

With regard to the defendant's first claim, that there was no misrepresentation by JHI, the court agrees to the extent that there can be no direct misrepresentation when the employment contracts were signed because JHI was not a party to the contract at the time it was offered by Uptain.

In *Luck v. Primus Auto. Fin. Servs. Inc.*, 763 So. 2d 243 (Ala. 2000), the plaintiffs, who were automobile lessees, brought an action against the salesman, the dealer, and the finance company claiming that they were told they would not have to pay an "acquisition fee," yet they later determined that such a fee had been charged to them and incorporated into their monthly payment. *Id.*, 763 So. 2d at 245. The trial court granted a summary judgment motion in favor of the financing company and the plaintiffs appealed. The Alabama Supreme Court affirmed the granting of the motion. It stated that the plaintiffs failed to prove the first element of a

21

misrepresentation claim in that there was no evidence indicating any contract between them and the finance company at the time of the transaction. *Id*. at 246. The court found that the finance company was not involved until after the lease had been negotiated.[18]  *Id*. Because the company had no contact with the plaintiffs, the court further found that it was impossible for the company to falsely misrepresent a fact to them.[19]  *Id*.

In the present case, there is no evidence that at the time of the purported misrepresentations that the defendant made any direct representations to the plaintiffs. That finding does not preclude the possibility that the plaintiffs' cannot undergird their claim on some other basis, such as an agency theory. However, because of the court's findings concerning the plaintiffs' assertions of agency liability on the contract claim are also applicable on the promissory fraud claim, the motion for summary judgment is due to be granted as well on this claim.

Even if the motion were not due to be granted on the foregoing grounds, the plaintiffs are not entitled to relief as a matter of law. As stated above, the plaintiffs must demonstrate that at the time of the misrepresentation, the defendant had the intention not to perform the promised act and that it had an intent to deceive. *Gardner*, 822 So. at 1209. The "mere fact that the promisor failed to perform the promised act is insufficient by itself to prove fraudulent intent for purposes of a promissory fraud claim." *Bryant v. Southern Energy Homes, Inc.*, 682 So. 2d 3, 5 (Ala. 1996). There must be evidence that the defendant intended to deceive the plaintiffs at the time the representation was made. *See Goodyear Tire & Rubber Co. v. Washington*, 719 So. 2d 774,

---

[18] The leases were assigned to the finance company.

[19] The court also noted that the fact that blank forms were provided by the company was insufficient in light of the fact that there was no showing that they contained some misrepresentation. *Luck*, 763 So. 2d at 246.

776 (Ala. 1998) ("there must be 'substantial evidence' of fraudulent intent that existed when the promise was made" to overcome a motion for a directed verdict).

The court finds that the evidence of present intent to deceive is absent in this case. Even the testimony of the plaintiffs refutes this element. As stated by the defendant, "Not a single plaintiff testified that she believed that Uptain did not intend to pay the bonuses when the promise was made." (Doc. 24 at 24 *citing* Speights Dep. at 41; Witherspoon Dep. at 65; Black Dep. at 69; Yelling Dep. at 52-53; McDonald Dep. at 49-50; Rawlinson Dep. at 40-41; Anderson Dep. at 45; Boglin Dep. at 53). Uptain also testified that he intended to pay the bonuses, but did not have the money. (Uptain Dep. at 54, 71-72). Accordingly, the motion for summary judgment is due to be granted on this claim as well.

### Negligence

The plaintiff's final claim is that JHI had a duty to insure that its agent/franchisee "had the financial wherewithal to pay the tax preparers when those tax preparers were ultimately directed by Jackson Hewitt, and fees generated ultimately benefitted Jackson Hewitt." (Second Am. Comp. at ¶ 45). Specifically, the plaintiffs argue that the defendant "owed a duty to make sure that individuals that it put into business, i.e., individuals such as Uptain, were financially viable." (Doc. 28 at 12). The defendant disagrees, stating it owes no such duty and, even if it did, it fulfilled its responsibilities in this case. (Doc. 24 at 30-33).

"To recover under a negligence claim, the plaintiff[s] must establish (1) that the defendant owed a duty to the plaintiff[s]; (2) that the defendant breached that duty; (3) that the plaintiff[s] suffered a loss or an injury; and (4) that the defendant's negligence was the actual and proximate cause of that loss or injury." *Ford Motor Co. v. Burdeshaw*, 661 So. 2d 236, 238 (Ala.

23

1995).

The first issue is whether JHI as the franchisor owed the plaintiffs a duty to make sure that the franchisee, Uptain, was financially viable. Neither party has cited any authority that is dispositive. The plaintiff offers various cases supportive of the general duty owed under the law not to harm or injure another. (*See* Doc. 28 at 12). The defendant cites *Kendrick v. Alabama Power Co.*, 601 So. 2d 912 (Ala. 1992), for the general proposition "that absent a special relationship, a third party, such as a franchisor, does not owe *any* duty to an independent contractor's employees." (Doc. 24 at 30-31) (italics in brief). It similarly cites cases from other jurisdictions for the premise that the "contractee" does not owe a duty to investigate the financial status of an independent contractor.[20]

Having reviewed the authorities cited by the parties, the court is unwilling to find that a franchisor is under a duty to investigate the financial status of a franchisee that is applying or operating as an independent contractor. To so find, particularly under the facts herein, would unduly discourage franchisors from affording opportunities to entrepreneurs who are trying to enter the market place but lack substantial financial backing sufficient in these litigious times. It

---

[20] The defendant states:

Numerous courts in other jurisdictions have specifically recognized a negligence claim cannot be premised on the theory that a contractee has a duty to investigate the financial status of an independent contractor. *See Alexander v. United States*, 63 F.3d 820 (9th Cir. 1995) (plaintiff's negligence claim fails because he could not show that defendant owed him a duty to hire a financially responsible contractor); *Graham v. Malone Freight Lines*, 43 F. Supp. 2d 77 (D. Mass. 1997) (standard of care is not breached even if trucking broker did virtually nothing to assure that independent contractor driver was financially competent); *Mavrikidis v. Petullo*, 707 A.2d 977 (N.J. 1998) (financial status of independent contractor cannot be basis for determining that principal is liable for retaining an incompetent contractor); *King v. Lens Creek Ltd. Partnership*, 483 S.E. 2d 265 (W. Va. 1996) (negligent hiring claim cannot be premised on alleged failure to exercise reasonable care in determining financial responsibility of independent contractor); *accord Morrisey v. Capstone Financial Services, Inc.*, 706 A.2d 1338 (R.I. 1998) (no duty to investigate the insurance status of an independent contractor prior to engaging services of contractor).

(Doc. 24 at 31).

would also require that the franchisor make diligent and continuing inquiries into the financial qualifications of the franchisee to protect the interests of potential claimants and the interests of third persons such as the franchisee's employees and creditors.  Imposition of such a duty is beyond the scope of this court's authority.

Even if the court were willing to impose such a duty on the defendant in this matter, the plaintiffs still must produce evidence of the second and third elements of a negligence claim, a breach of that duty and foreseeability.  The only evidence offered by the plaintiffs is the testimony of Uptain at his deposition that he could not remember whether JHI had any requirement for capitalization before he received his first franchise.  (Doc. 28 at 13).  This is insufficient as a matter of law.  It does not show a breach of any such duty.  Additionally, the record demonstrates that the defendant did investigate Uptain's financial status prior to granting him the franchises.  There is no evidence before the court that shows that Uptain's capitalization at the time the inquiries were made was so deficient that it was foreseeable that he would fail.  To the contrary, the evidence shows that at the time of his applications, the defendant required Uptain to submit a financial statement that showed that he had a net worth of over one-half a million dollars.  (Uptain Dep. at 72-73 and Ex. 2).  The defendant also obtained a credit report on Uptain to verify the financial information provided by Uptain.  (Hapward Dep. at 27-29 & Ex. 3). He also had seventeen years experience in the tax preparation business that included management responsibility over twenty-one H&R Block offices.  (*Id*. at 94).  Under the circumstances, the plaintiffs' negligence claim must fail.

## CONCLUSION

Premised on the foregoing, the court finds that the defendant's motion for summary

25

judgment is due to be granted and this action dismissed with prejudice and the motion for class certification is moot. An order consistent with the court's finding will be entered contemporaneously herewith.

     **DONE**, this the ___12ᵗʰ___ day of March, 2003.

                                        **JOHN E. OTT**
                                        United States Magistrate Judge

26